UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Rheanna Carlson, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CV 50122 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

In 2008, when plaintiff Rheanna Carlson was 13 years old, she passed out during a basketball game. This was the beginning of the medical problems now forming the basis of her disability claim. Over the next four years, she had additional fainting episodes (sometimes referred to as syncope), although there was a symptom-free period of 13 months. She also claimed to suffer from fatigue, dizziness, memory and concentration problems, anxiety, depression, sensitivity to warm weather, headaches, and body pains. She missed school and was afraid of crowds. She visited doctors to pinpoint the cause. In 2010, for example, she saw a local neurologist who prescribed seizure medication, although it did not improve her condition. Eventually, plaintiff's parents decided a more comprehensive review was warranted. In March 2012, they took her to the Mayo Clinic for a multi-day evaluation by a team of specialists. She was examined by a cardiologist, neurologist, psychologist, and a pediatrician. Dr. Sarah Kizilbash, the pediatrician, spearheaded these efforts. After collecting all the analyses, she diagnosed plaintiff with a condition called postural orthostatic tachycardia syndrome or "POTS" for short.

POTS is a relatively new condition, and the Mayo Clinic "coined" the term and has been a pioneer in bringing attention to it. R. 397. Dr. Kizilbash is the lead co-author of a 2014 article educating doctors about this little understood condition. *See* "Adolescent fatigue, POTS, and Recovery: A Guide for Clinicians," *Current Problems in Pediatric and Adolescent Health Care*, 44: 108-133, (2014) (hereinafter, the "Kizilbash Article" or "KA").[1] Doctors needed educating because some of them doubted whether POTS is "a legitimate physical diagnosis." *Id.* at 109. As summarized in the article, as well as in other similar articles submitted by plaintiff in this case, the primary symptom is "lightheadedness or fainting [] accompanied by a rapid increase in the heartbeat" which is "relieved by lying down again." R. 400. Fatigue is another prominent symptom. POTS is more common in women, especially adolescent women. *Id.* Although each case of POTS has its unique features, the Kizilbash Article provides the following general overview of treatment and prognosis:

> Full recovery is possible with multi-faceted treatment. The daily treatment plan should consist of increased fluid and salt intake, aerobic exercise, and regular sleep and meal schedules; some medications can be helpful. Psychological support is critical and often includes biobehavioral strategies and cognitive-behavioral therapy to help with symptom management. More intensive recovery plans can be implemented when necessary.

*Id*. at 108; *see also* at 128 ("Aerobic exercise is a key to successful recovery.").

In plaintiff's case, Dr. Kizilbash advised her to follow treatment recommendations similar to the ones described above. She told plaintiff to exercise three to five times a week to achieve a target heart rate and to drink saltwater. Ex. 1F at 4-5, 19. She also prescribed metoprolol and fluoxetine, and advised plaintiff see a psychiatrist to treat her anxiety and depression. *Id.* Dr. Kizilbash apparently did not believe that plaintiff needed the more intensive recovery plan option.

---

[1] This article is the source for the Mayo Clinic's summary of POTS currently on its website.

Four months after returning from the Mayo Clinic, plaintiff filed her disability applications. Over the next two and half years leading up to the administrative hearing in 2016, she was treated by local doctors. Her POTS care was managed by Dr. Marc Ovadia, a pediatric cardiologist. Plaintiff saw him on May 2012, August 2012, March 2013, October 2013, December 2014, and February 2016, and perhaps other dates.

After returning from the Mayo Clinic, plaintiff also saw a therapist and a psychiatrist, Dr. Geiger, for medication review. Dr. Geiger prescribed Prozac to treat plaintiff's depression. After several visits, Dr. Geiger concluded that plaintiff's depression was in remission, and plaintiff eventually stopped seeing the therapist and only saw Dr. Geiger for medication review.

Over this time, plaintiff graduated from high school, and scored a 29 on the ACT.[2] She attended Rock Valley Community College for a year and a half, but had to drop out because she "could not stop from feeling dizzy and passing out." R. 46. In 2014 and 2015, plaintiff also worked several part-time jobs, but stated that that they "stopped scheduling" her because she was "passing out." R. 47.

A hearing was held on March 29, 2016. After eliciting background information, the ALJ asked about several issues. One was whether plaintiff was passing out completely. The following question and answered ensued:

> Q  Now, while [your] records show a history of syncopal episodes or dizziness, they don't show you actually passing out. I saw really [not][3] at all, let alone [] on a frequent basis like you're telling me. Are you actually passing out or are you just getting dizzy?
>
> A  No. I actually do pass out and black out completely.

R. 47-48.

---

[2] The Kizilbash Article states that most adolescents with POTS "are characterized as 'high achievers'" and "typically get excellent grades and are successfully involved in multiple extracurricular activities." *Id.* at 113.
[3] This word appears to be missing from the transcript.

3

The ALJ next asked about Dr. Ovadia's treatment notes because she was concerned that they did not support plaintiff's testimony. Here is the relevant exchange:

> Q His notes in December of 2014 indicate only rare syncope and rare headaches. That doesn't sound consistent with what you're telling me.
>
> A It's changed over the past couple of years. Most recently.
>
> Q Well, again, his most recent records are February of this year. I don't see any indication of passing out. It's not mentioned. You don't appear to have complained about it. In fact, he noted that you were pushing yourself to exercise more, and he wrote that that is helping you a lot.
>
> A He was the one that suggested to start exercising to keep my blood pressure elevated.

R. 48.

The ALJ asked whether plaintiff had gone to the emergency room as a result of passing out. She stated that she had done so "years ago," but had not gone anymore because she "learned to maintain after [she] pass[es] out." R. 49. The ALJ asked whether she ever passed out while sitting down. Plaintiff stated that she had. R. 49, 55 ("it's hard to say when I'm going to pass out. It happens standing up, sitting down, laying down, kneeling.").

The ALJ asked about plaintiff's depression. The following colloquy ensued:

> Q Do you still see Dr. Geiger []?
>
> A Yes, ma'am.
>
> Q And [it] looks like you only see her maybe once a year.
>
> A Yes.
>
> Q No counseling in addition to that?
>
> A Not currently. No.
>
> Q And she prescribes medication for you?
>
> A Yes ma'am.

4

> Q  Do you feel like those medications help you?
>
> A  To an extent, yes.
>
> Q  Well, her notes seem to suggest that you're doing quite well. In fact, she lists your depression as being in remission. Do you agree with that?
>
> A  No, I don't.
>
> Q  Okay. So, if you think it's worse than that, why don't you go on and see her more often than once a year?
>
> A  I don't—I just go by what she tells me when to come back.

R. 50.

The ALJ also asked about conflicting reports plaintiff gave to doctors about using marijuana and alcohol. Plaintiff admitted using these substances, but claimed she did so "[v]ery rarely," estimating that she smoked pot once or twice a month when she was with friends. R. 51.

One important piece of evidence discussed later in the decision was a seizure log completed by plaintiff and her family. Ex. 17E. (The log was not discussed at the hearing.) It was a pre-printed form with three columns, the first labelled "Date and Time of Seizure," the second "Type of Seizure/Symptoms," and the third "Witness." It covers the period from October 2014 to March 2016 and contains, by this Court's rough estimate, around 250 handwritten entries. In the "symptoms" column, by far the most common phrase was "absence seizure." Other entries included "migraine," "dizzy spells," "overheated," and "fatigue."

After the hearing, plaintiff's counsel contacted Dr. Ovadia asking for "clarification" on two issues—whether a neurologist is the proper doctor to treat POTS and whether the frequency of symptoms on the log was "consistent with [Dr. Ovadia's] conversations with Ms. Carlson and her mother." R. 650. On April 12, 2015, Dr. Ovadia submitted the following written answers:

> 1. The management of this very crippling and difficult condition involves trial of one or two medications at a time with changes of medication when these lose their effect. Rheanna has one of the more severe combinations of symptoms, including chronic fatigue, and loss of consciousness episodes, which have led to her being fired.[4]
>
> Participation by a neurologist may be needed in the future for Rheanna, perhaps even more than once. POTS is treated by both cardiologists and neurologists, sometimes individually or as a team depending on the symptom profile.
>
> 2. Rheanna's log of her POTS symptoms is consistent with conversations with Rheanna and her mother both during office visits and often via telephone conversations.

R. 651.This letter was not seen by the ALJ before she issued her decision, but it was submitted to the Appeals Council.

On April 13, 2016, the ALJ issued a 17-page decision finding plaintiff capable of doing light work. The ALJ found plaintiff's testimony not credible based on several rationales. First, the objective evidence did not support her claim that the problems were severe and frequent. Among other things, the ALJ noted that Dr. Ovadia wrote in December 2014 that plaintiff's headaches and fainting were "rare"; that Dr. Geiger concluded that plaintiff's depression was "in remission"; and that there was "no mention of syncope or other POTS symptoms" by Dr. Geiger or the therapist. R. 29. Second, plaintiff only sought sporadic treatment. She stopped going to therapy, never went to the emergency room despite alleging that she repeatedly passed out completely, and infrequently saw Dr. Ovadia with a "hiatus" of 15 months, then another gap of 14 months. Third, plaintiff's condition improved when she followed the treatment recommendations. The ALJ noted that plaintiff's symptoms worsened in a period when she stopped exercising and improved in another period when she was exercising. Fourth, plaintiff gave conflicting answers about her alcohol and marijuana use.

---

[4] The Court notes that this paragraph makes no reference to exercise as form of treatment.

**DISCUSSION**

Plaintiff raises three principal arguments for remand. The first is the longest and most complicated. It consists of series of smaller arguments supporting the general conclusion that the ALJ misunderstood POTS. *See* Dkt. #9 at 5 ("It is not uncommon for an ALJ to fail to properly address the complex condition that is POTS."). For this reason, plaintiff argues that the ALJ should have called a medical expert. The remaining two arguments are much shorter. The second argument is that the ALJ erred in giving little weight to Dr. Ovadia's opinions. The third is that a Sentence 6 remand is warranted based on Dr. Ovadia's "clarification" statement. The Court is not persuaded that these arguments justify a remand.

Before considering them, it is important to keep in mind that they do not directly challenge most of the ALJ's findings. Plaintiff has not disputed that she sought only limited treatment, that there is little objective evidence corroborating the frequency of her subjective allegations, and that she got better when she followed the treatment recommendation to exercise regularly. She also has not disputed that she gave conflicting answers on her marijuana and alcohol use. In short, plaintiff's arguments, even if successful, would leave the central pillars of the ALJ's decision intact. This makes her path to a remand a difficult one.

**I.    The ALJ Allegedly Made Multiple, Inappropriate Medical Judgments.**

This first argument contains a series of broad and narrow assertions joined together. Some, such as a vague accusation of cherrypicking, are undeveloped. After sorting through them, the Court understands plaintiff's main contention to be something along the following lines: the ALJ, while ostensibly accepting that plaintiff had POTS, secretly questioned this diagnosis and

specifically believed that she had *no* fainting episodes at all. As explained below, the Court is not persuaded that the ALJ's decision rests on any such all-or-nothing determination.

Plaintiff's offers two lines of argument to support this theory. The first is that the ALJ supposedly was confused about, or alternatively failed to clarify, evidence about plaintiff's possible seizures and evidence about her fainting episodes. The Court agrees that there was some confusion in the record about these two symptoms, but this confusion was not caused by the ALJ, but instead arose primarily from plaintiff's equivocal positions on whether she was having seizures in addition to fainting episodes. In fact, even now, after reading plaintiff's briefs, this Court is not clear on her position.

To recap the relevant background, plaintiff saw a pediatric neurologist, Dr. Phillip Miner, in 2010. This was before she went to the Mayo Clinic. According to plaintiff's testimony, but not confirmed by any medical records, Dr. Miner prescribed seizure medication, but it did not help. In her visit to the Mayo Clinic, Dr. Kizilbash asked that plaintiff be evaluated for possible seizures, but there was no evidence that her episodes should be classified as seizures. Finally, as already noted, plaintiff submitted a log stating that she was suffering "absences seizures" on a near-daily basis in 2014-2016.

At the hearing, the ALJ recognized that the record was unclear, and attempted to clarify it in the following exchange:

> Q  Now, you have characterized some of your episodes as seizures, but I didn't see that any doctor diagnosed you with seizures.
>
> A  Yes, ma'am.
>
> Q  Who diagnosed you with seizures.
>
> A  A neurologist that I did go to.
>
> Q  What was the name of that neurologist?

A Miss—or Dr. Miner []. I'm sorry.

Q Okay.

ALJ: Counsel, if you see any reference to a diagnosis of seizures, I would like to know where that is because I didn't see it.

CLMT: Was that in the medical records?

ATTY: Right. Judge, we ordered Dr. Miner's records. They did not come in. I don't believe that they followed up with Dr. Miner. I think they transferred care to Dr. Ovadia. So, I didn't press to keep the record open. But if you would like me to submit those records, I can.

R. 52-53.[5] This testimony undermines one of plaintiff's arguments. In her opening brief, plaintiff faults the ALJ because she supposedly "never asked" plaintiff about these issues and because she did not try to "differentiate" between the seizure and fainting allegations. Dkt. #9 at 8. Yet, as the above quotation demonstrates, the ALJ gave both plaintiff and her counsel a chance to provide clarity, but neither was able to do so.

As for the seizure log, the ALJ did not ask plaintiff about it at the hearing, but neither did plaintiff's counsel. However, in the ALJ's decision, she referred to it several times. She also addressed both the seizure and the fainting evidence throughout the decision. In the Step Two analysis the ALJ concluded that there was no evidence substantiating that plaintiff had seizures, and that this symptom therefore could not qualify as a severe impairment. *See* R. 20 ("the record does not contain a diagnosis of seizures or epilepsy by an acceptable medical source"). Plaintiff has not challenged this conclusion here.

---

[5] Later in the hearing, the ALJ asked why plaintiff didn't go to a neurologist if she were having severe headaches as she claimed. Plaintiff stated that she needed to find a different neurologist because the one she went to previously (*i.e.* Dr. Miner) "didn't know what he was talking about." R. 54. It thus seems that, at a minimum, plaintiff had doubts about the seizure diagnosis (assuming one was even made).

9

As for charge that the ALJ then conflated the seizure evidence with the fainting evidence, the Court does not find this to be the case. In reading through the ALJ's opinion, the Court notes that the ALJ referred numerous times to the evidence about plaintiff's fainting episodes, mostly by using the phrase syncope or near syncope. This issue was not hidden. For this reason, the Court is not persuaded that the ALJ unthinkingly lumped together the two types of evidence.

To the extent that there was confusion in the decision, it is important to remember that it arose initially from the decision of plaintiff and her family members to describe her episodes "absence seizures." Plaintiff now takes the position that this was a mistake, and that everyone was really referring to fainting episodes. Counsel attempts to blame this problem on the Social Security Administration because the log given to plaintiff included the word "seizure" in two columns. This is true, but it does not explain why plaintiff and her family used the more specific phrase "*absence* seizures." Insofar as this Court can tell, none of plaintiff's doctors used this phrase. Counsel also argues that plaintiff was not a medical expert and "cannot be expected to identify her episodes as seizure related or POTS related." Dkt. #9 at 8. But this assertion ignores the fact that plaintiff had been to the Mayo Clinic and had been educated about POTS and that she continued her POTS treatment with Dr. Ovadia. The Court does not find these two explanations to be convincing. But the larger point is that the ALJ made a reasonable effort to untangle the confusion, and the Court finds that there was not any material confusion.

The other line of evidence supposedly showing that the ALJ secretly doubted the POTS diagnosis is the statement from the Mayo Clinic cardiologist (Dr. Cannon) that there were "no cardiac causes" for the fainting. R. 26. The ALJ mentioned this statement several times in the decision. Plaintiff argues that, by citing to this statement, the ALJ was signaling that she did not believe that plaintiff had POTS. Plaintiff argues that POTS is not necessarily caused by cardiac

problems. Accepting this contention as true, the Court still does not find that the reference to this issue was an error worthy of remand. The ALJ did not cite the statement to show that plaintiff did not have POTS, but cited it as a part of the overall summary of the evidence about the *extent* of plaintiff's problems. In sum, the Court finds that any error was harmless given the numerous other undisputed rationales relied on by the ALJ.

Plaintiff characterizes the ALJ's decision as resting on an implicit rejection of *all* of plaintiff's alleged symptoms. But the Court interprets the ALJ's decision as resting on a more nuanced finding, which was that plaintiff's symptoms were not quite as severe and frequent as she claimed. Plaintiff has portrayed herself as a person with a severe and basically incurable form of POTS. She stated that she completely passed out on numerous occasions and did so not just when standing up, but also while sitting and lying down. She stated that these problems had been going on for almost a decade, and argued that they were getting worse after she saw Dr. Ovadia in 2014. In other words, her condition deteriorated in the two year period right before the administrative hearing, which was also during the time when she saw her doctors less frequently. The ALJ found these allegations not fully credible for the reasons already summarized above. The Court cannot find any basis for second-guessing these rationales.

Importantly, the ALJ's rationales for rejecting plaintiff's claim do not depend on the precise labelling of plaintiff's symptoms (*e.g.* seizure versus fainting) or even on whether the overall diagnosis was POTS or whether the POTS was caused by cardiac or non-cardiac causes. The ALJ concluded that, whatever the symptoms were, plaintiff generally did not seek medical attention on a sustained basis after receiving the diagnosis for POTS in 2012 and, when she did, she did not complain about the extent of the problems in the way she does now. Lack of treatment is a valid and common rationale used to discount a claimant's credibility. This is not a

case in which the claimant had problems in seeking medical attention. Her parents took the somewhat unusual and difficult step of taking her to the Mayo Clinic for a multi-day evaluation.

Throughout the decision, the ALJ noted that there was little objective documentation that plaintiff was completely passing out on a frequent basis. The ALJ noted that the medical records did not corroborate this claim. Dr. Ovadia, for example, stated that she had rare syncope. At the hearing, plaintiff was asked about this discrepancy, and she only stated that she "didn't think" that Dr. Ovadia knew that she was passing out often. R. 63. The ALJ also noted that there was little documentation of fainting episodes in non-medical records. Plaintiff has argued that she cannot work because she was fired from three separate jobs "due to passing out." R. 47. But there are no records from employers to confirm this assertion, although one co-worker did note that plaintiff once fell from a ladder. R. 300. Likewise, plaintiff argues that she dropped out of Rock Valley Community College because she was passing out. But there do not seem to be any records confirming these incidences.[6] The Court is not suggesting that every fainting episode would have required a trip to the emergency room or the calling of a doctor or the filing of an official report memorializing the event, but it does raise a question whether there wouldn't be at least be a few such instances if plaintiff were completely passing frequently in public places— *i.e.* at high school, college, and three workplaces.

Another issue the ALJ expressed skepticism about at the hearing, and then indirectly touched on in the decision, was plaintiff's claim that she passed out while sitting down. The articles submitted by plaintiff, as well as the Kizilbash Article, refer to dizziness or possibly fainting while *standing upright*. *See* KA at 119 ("By definition POTS is excessive heart rate . . .

---

[6] There was one letter in the file in which a Rock Valley employee noted that plaintiff was having some problems "remembering things" and was "struggling more than the average college-prepared student," but this letter did not mention any incidents of passing out. R. 533.

when moving from supine to upright position."); R. 400 (article submitted by plaintiff stating that the "faintness or lightheadedness of POTS are relieved by lying down again"). In reviewing the record, the Court noted that plaintiff's mother wrote that plaintiff was still able to drive, despite having POTS, because the "sitting position does *not* affect fainting." R. 292 (emphasis added). Although this contradiction between plaintiff and her mother was not cited by the ALJ in the decision, it provides additional support for the ALJ's conclusion that plaintiff was not fully credible in her testimony. Plaintiff's continued willingness to drive points to a larger issue, which is that she was engaging in a fairly broad set of activities, including graduating from high school, going to college for a year and a half, working three part-time jobs, exercising for an hour a day for some period, and even smoking marijuana once or twice a month with friends. Although plaintiff had to drop out of college and was not able to sustain employment over a longer period, she still demonstrated *some* ability to interact with others despite her fears that she might faint. In 2015, Dr. Ovadia indicated that plaintiff was able to work three days a week and suggested that she might eventually work full-time. Given all this evidence, the ALJ could have concluded that plaintiff would be capable of working full-time if she consistently followed treatment recommendations and continued progressing in her recovery.

As for plaintiff's current request that an expert should have been called at the hearing (plaintiff did not make such a request at the hearing itself), the Court is not persuaded that an expert would have helped. For one thing, it is unlikely that the doctors typically called as experts by the SSA would have had any particular expertise is this complex condition that is not understood by many doctors. More importantly, plaintiff was actually treated by one of those experts, and the ALJ's decision is in accord with the doctor's findings and recommendations.

For all the above reasons, the Court is not persuaded that this first argument, which is the one plaintiff devoted the most attention to, justifies a remand.

II. **Remaining Arguments.**

Plaintiff's second argument—that the ALJ erred in giving little weight to Dr. Ovadia's opinions—is only a paragraph in the opening brief, and it rests on similar arguments as those discussed above. There are three opinions or statements. First, in December 2014, Dr. Ovadia wrote a letter to another doctor, summarizing plaintiff's condition and stating the following at the very end: "She is clearly disabled and has lost job after job with syncope." R. 602. Second, on August 6, 2015, he wrote a short email to plaintiff's employer, Rockford Brewing Company, stating as follows: "I am the cardiologist that has been treating Rheanna Carlson for several years. She is cleared to work 3 full time days with no restrictions. Assuming she tolerates this work schedule, we will likely increase the hours she may work." R. 597. Third, on February 26, 2016, he again wrote a letter to the same doctor he wrote to in 2014, repeating a similar statement. R. 596 ("She is clearly completely disabled having lost job after job with syncope.").

The ALJ concluded that the December 2014 statement that plaintiff was "clearly disabled" was inconsistent with his notes from the same month indicating that plaintiff had rare syncope and was working part-time and going to college. The ALJ also noted that Dr. Ovadia only saw plaintiff "infrequently," that he only made conservative recommendations, and that plaintiff was not consistently following the Mayo Clinic's recommendations to exercise regularly. R. 30. Plaintiff overlooks these rationales and focuses on the ALJ's additional statement that Dr. Ovadia reported that plaintiff had "[n]o cardiac abnormality other than

14

supraventricular tachycardia" and that he "elected not to ablate because it was not 'clearly symptom-causing.'" *Id.* For the same reasons discussed above, the Court finds that plaintiff's argument does not justify a remand. Plaintiff only attacks one aspect of the ALJ's explanation for rejecting Dr. Ovadia's opinion and ignores the main rationales. Further, in her reply brief, she did not return to this argument at all.

Plaintiff's third argument is that the case should be remanded pursuant to Sentence Six so that the ALJ can consider Dr. Ovadia's "clarification" statement. The Court finds that statement does not address, and does not cast doubt on, the ALJ's main rationales, including the lack of contemporaneous documentation and infrequent treatment. This opinion is also similar to the previously-submitted ones discussed in Argument #2, and does not rest on any first-hand knowledge and relies essentially on plaintiff's self-reports. As noted previously, the ALJ offered multiple reasons for discounting plaintiff's subjective reports. Plaintiff believes that this letter is a "clarification," but this very characterization suggests at the same time that it is not material. For these reasons, this argument does not justify a remand.

## CONCLUSION

For the foregoing reasons, plaintiff's motion is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: October 24, 2018　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

15